UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| COMITÉ PATRIOTICO CULTURAL PUERTORRIQUEÑO, INC., JANIFFER CARMONA <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH VAS, MICHAEL KOHUT, DONALD PERLEE, CITY OF PERTH AMBOY, <br><br> Defendants | Civ. Action No. 05-2665 (KSH) <br><br><br><br> **Opinion** |

**KATHARINE S. HAYDEN, U.S.D.J.**

Every year since 1993, over a weekend in June, the City of Perth Amboy has held the Hall Avenue Festival, whose purpose is to celebrate Puerto Rican heritage. In the beginning, the city ran the event. From the record it appears that by 2001-2002, Comité Patriotico Cultural Puertorriqueño, Inc. (Comité), plaintiff in this lawsuit, had assumed responsibility as festival organizer. The festival is timed to coincide with the New York City Puerto Rican Day Parade, and features live music and food and draws large crowds.

In 1996, Perth Amboy adopted a public entertainment ordinance regulating street festivals. In 2005, Perth Amboy municipal officials sought to enforce a ban on live amplified music at the Hall Avenue Festival, relying on language in the ordinance, and Comité filed this litigation, seeking emergent relief on first amendment and equal protection grounds. (D.E. 1.) The Court held hearings, and ultimately the 2005 festival went forward, as have the 2006, 2007, and 2008 festivals. Having been sparring partners who can mount the event successfully but cannot heal the divisions between them, the parties are seeking a ruling on the two constitutional claims asserted by Comité:

1

that Perth Amboy's public entertainment ordinance violates the first amendment; and that municipal officials' conduct in denying a festival permit in 2005 violated the equal protection clause.

Procedurally, the case has moved through the initial emergent applications, hearings and rulings, through discovery and an unsuccessful mediation, to dispositive motions with full briefing and extensive oral argument, and finally to a bench trial on the permanent injunction sought by Comité against enforcement of specific provisions of the public entertainment ordinance, and on the equal protection claim after the Court denied Perth Amboy's motion for summary judgment. After most of the witnesses were called at the trial, the parties engaged in negotiations, which were unsuccessful.  The Court will rule in this opinion on the first amendment claim, as to which the parties have called all their witnesses.  (See Letters from Counsel (D.E. 69, 70, 71, 72).)

I.     **Comité's First Amendment Challenge to the Public Entertainment Ordinance**

Comité makes a facial challenge under the first amendment to four sections of the ordinance: (1) the permit application process (§ 343-3(E, F, G)); (2) the restoration bond requirement (§ 343-4); (3) the liability insurance and hold harmless requirements (§ 343-9); and (4) the minimum security requirement (§ 343-10).  (Ex. P-1.)

    a.   Application Provisions

Comité argues that the application process through which the city issues a festival permit violates the first amendment's requirement for "narrow, objective, and definite standards," Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992)(quoting Shuttlesworth v. Birmingham, 394 U.S. 147, 150-51 (1969)), because it (1) does not set forth specific grounds for city officials to deny a permit; (2) does not place limits on the additional conditions the council can impose on a group; and (3) does not state the criteria by which the mayor decides whether to express his concurrence on the permit.  (Pl. Supp. Br. on first amendment issue 9.)  The relevant provisions state:

**§ 343-3 Application process; fees.**

E.   The City Clerk shall forward applications to the Business Administrator, who shall ... within 30 days ...:

   1.   Provide a copy of the application to the Directors of the Departments of Police, Fire and Public Works.
   2.   Convene a meeting of the Directors of Police, Fire and Public Works to determine the sufficiency of the application, pursuant to the requirements of this chapter, and to solicit input as to any matters pertinent to their Departments.
   3.   Forward copies of the application to the Mayor and the City Council, along with the recommendations of the Business Administrator and the Directors of Police, Fire and Public Works.

F.   The City Council shall consider a resolution to approve or deny the special permit sought within 30 days after receipt of an application from the Business Administrator .... Any resolution to approve a special permit may be conditional upon compliance with specific requirements contained in said resolution. The issuance of any special permit pursuant to this chapter shall be subject to the concurrence of the Mayor.

G.   The Mayor shall, within 15 days of the date the City Council adopts a resolution approving a special permit pursuant to this chapter, advise the applicant, in writing, whether the Mayor concurs with the action of the City Council and whether a special permit will be issued. A copy of said letter shall be forwarded to the City Council. ...

   b.   Restoration Bond Requirement

Comité argues that the restoration bond requirement unconstitutionally permits the city to impose charges based on the content of speech; is overbroad because $2,000 may be too high for some smaller events; and does not contain an indigency waiver. (Pl. Br. in support of first amendment claim 28-29; Pl. Supp. Br. on first amendment issue 5.) That requirement reads:

**§ 343-4 Restoration bond requirements for events on property owned by the City of Perth Amboy.**

   A.   A special permit for a public entertainment event on property owned by the City of Perth Amboy shall not be issued until the applicant has posted a restoration bond with the City Clerk in the form of cash, certified check or surety in the amount of $2,000. Said bond shall be posted no later than 30 days before the first day of the event for which the permit is sought .... The city shall have the right to make charges against the bond for costs incurred as a result of the failure

3

of the applicant to adequately clean and restore the location of the event. Upon the certification of the Director of Public Works that the applicant is entitled to a return of all or a part of the restoration bond, the amount so certified shall be returned to the applicant.

B.  The requirements of this section for public entertainment events on property owned by the City of Perth Amboy shall apply to all first-time permit applicants and all applicants that have, in any prior year, failed to complete the cleaning and restoration plan in a manner that is satisfactory and timely, as determined by the Director of Public Works.

c.  <u>Insurance and Hold-Harmless Requirements</u>

Comité challenges this portion of the ordinance as too broad, arguing that the language applies to <u>any</u> possible liability arising from the event, including, for example, excessive use of force by the police; allows for content-based charges; does not to contain an indigency waiver; and bears no relation to a legitimate government purpose. (Pl. Supp. Br. on first amendment issue 5, 8; Pl. Br. in support of first amendment claim 29-31.) The requirements state:

§ 343-9 Liability Insurance required.

A.  A special permit for a public entertainment event on property owned by the City of Perth Amboy shall not be issued until the applicant has obtained a general liability insurance policy, with the City of Perth Amboy as a named insured, in the amount of one million ($1,000,000.) for the event for which a permit is sought. In addition, a permit shall not be issued until the applicant executes a hold harmless and indemnity agreement to the benefit of the City of Perth Amboy. Proof of the liability insurance and the hold harmless and indemnity agreement required as a condition precedent to the issuance of a permit shall be provided to the City Clerk no later than fifteen (15) days before the first day of the event for which a permit is sought.

d.  <u>Minimum Security Requirement</u>

Comité claims the minimum security requirement provision is constitutionally offensive because it allows police "unlimited discretion" to set the number of police officers using content-based considerations. (Pl. Supp. Brief on first amendment issue 7.) It reads:

§ 343-10 Minimum Security requirements.
A.  No special permit for public entertainment on property owned by the City of Perth Amboy or on private property shall be issued until the applicant has

4

entered into a contract with the City of Perth Amboy authorizing the hiring of off-duty police officers by the applicant at the hourly rates set forth in the Police Ordinance for the purpose of providing security at the public entertainment event.

[Sections B, C, and D set the minimum number of police officers needed at McWilliams Stadium, Sadowski Park and Parkway, and Rudyk Park.  These sections are not relevant to the Court's analysis.]

E.  The minimum number of off-duty police officers which shall be required for public entertainment events at any location other than those specifically referred to in this section shall be determined by the Director of Police.  The Director of Police may consider any other reasonable proposal by the applicant with respect to the provision of security at a public entertainment event.

F.  During a public entertainment event, the Director of Police, the Director's designee or the highest ranking on-duty police officer may require the applicant to hire such additional off-duty police officers as may be necessary in the interest of public safety, based on the information provided by the applicant, or as a result of observations made at the time of the event.

## II.  **Applicable Third Circuit Precedent**

### a.  2007 Third Circuit Decision in *Nationalist Movement v. City of York*

In determining whether any or all of the foregoing provisions must be stricken under the first amendment, the Court sought the parties' positions on the import of Nationalist Movement v. City of York, 481 F.3d 178 (3d Cir. 2007), which was handed down while dispositive motions were pending. There, as here, a group seeking to hold a public event sought to strike provisions of a municipal ordinance.

The Nationalist Movement, a white supremacist organization, filed a permit application in June 2002 to hold Henry Schaad Day, an event to honor a Caucasian rookie police officer who was shot and killed during race rioting in York in July 1969, and a King Holiday Protest at York Hall during the following January.  After its application was denied, The Nationalist Movement sued the city of York, Pennsylvania, raising first amendment objections to various provisions in its ordinance regulating public events.

5

The Third Circuit focused on the portion of the York ordinance that prohibited persons from "'[c]onduct[ing] a public assembly, parade, picnic, or other event involving more than twenty-five individuals' on public land without first obtaining a permit." City of York, 481 F.3d at 181 (quoting § 741.03(c)(1)(A)). Permit applicants had to (1) file a written application; (2) pay an application fee ($50 for city residents and $100 for non-residents); (3) sign an agreement "in which the applicant shall promise and covenant to bear all costs of policing, cleaning up and restoring the park; . . . to reimburse the City for any such costs incurred by the City; and to indemnify the City and hold the City harmless from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the permittee or its agents"; and (4) pay a user fee. Id. (quoting § 741.03(d)(6)). The ordinance provided a waiver of the requirements for a user fee, security deposit, and certificate of insurance "if the activity is protected by the first amendment of the United States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity." Id. (quoting § 741.03(f)(3)).

Procedurally on the trial level, the parties in City of York had filed motions for summary judgment, and in a written opinion reported at 425 F. Supp. 2d 574 (M.D. Pa. 2006), the district court had determined that the security deposit and certificate of insurance requirements violated the first amendment because the city could charge higher fees based on the content of the applicant's message. The district court upheld the rest of the ordinance and rejected The Nationalist Movement's as-applied and equal protection arguments.

The Third Circuit affirmed in part and reversed in part. Writing for the court, Judge Barry ruled that under Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992), an ordinance requiring a permit and fees before authorizing a public speaking event, parade, or assembly in a traditional public forum constitutes a prior restraint on speech; that as such there is a heavy presumption against validity; that the government has an interest in regulating "competing uses" of

6

public space; and that a prior restraint in an ordinance must be a valid time, place, and manner restriction, one that "leaves open ample alternatives for communication and is content-neutral and narrowly tailored to serve a significant governmental interest." City of York, 481 F.3d at 183. Of significance here, see infra, the opinion holds that prior restraints in an ordinance "must not delegate overly broad licensing discretion to a government official." Id. (citing Forsyth County, 505 U.S. at 130).

Applying the Forsyth County analysis to the York ordinance, the court found that the application fee York charged permit applicants was permissible. There was "no discretionary component involved in setting the application fee"; it was applied across the board to all applicants; the fee was nominal, not content based, and was "narrowly tailored to allow the city to recoup the cost of processing the application." Id.

But the provisions of the ordinance providing for a security deposit, reimbursement, and certificate of insurance were another matter, because the city's permit scheme imposed financial accountability for damage caused by an event "tak[ing] into account the resulting expense of an event in assessing a fee." Id. at 184. The Third Circuit agreed with the district court's determination that this effectively placed "a premium on—what the city views as—unpopular speech." Id. at 185 (quoting Nationalist Movement v. City of York, 425 F. Supp. 2d 574, 585 n.6 (M.D. Pa. 2006)).

The Third Circuit also found unconstitutional the reimbursement provision, which required a speaker to pay, subsequent to the event, the actual costs that the city incurred. The full text of its analysis is instructive.

> The broad language of the reimbursement provision clearly allows the City to charge a speaker not only for costs rightfully associated with its event, but with numerous other, content-based, costs. For example, the City would incur expenses planning for the public's reaction to the speech, making available the necessary resources to contain potential counter-demonstrators, providing an appropriate level of police presence to control and pacify counter-demonstrators, and generally protecting the speaker. All of these actions would necessarily require a

7

consideration of the content of the proposed speech and the anticipated reaction of the public. If we countenanced a charge for such expenses, we would be allowing the ruling in <u>Forsyth County</u> to be undermined by the simple expedient of charging content-based fees after an event has taken place rather than before and we would be ignoring precedent of long standing holding that speech cannot be burdened because of the reaction of others.

Indeed, in many ways, the reimbursement provision is even more offensive to the First Amendment than the security deposit and insurance requirements struck down by the District Court. An applicant who signed the agreement required by the reimbursement provision would have no way of knowing the scope of the liability to which it might be subjecting itself. Although an applicant can plan for the level of participation by members of its organization, it simply cannot accurately anticipate the actions of others or the anticipated reaction of the police. To require an applicant to agree to pay this unquantified fee—which is based substantially on the anticipated and actual reaction of others—before it can speak is an unconstitutional chilling of speech . . . .

Furthermore, the reimbursement provision is ripe for abuse. In deciding how best to police the event and charge the speaker, the City is given unlimited discretion which could easily be used to punish (or intimidate) speakers based on the content of their messages. Given the substantial expense that could be levied upon a speaker, and the almost limitless possibility of abuse, it is an understatement to conclude that this provision chills constitutionally-protected speech.

<u>Id.</u> at 185-87 (footnotes and citations omitted).

    b.   Does <u>City of York</u> Apply to the Perth Amboy Ordinance?

If <u>City of York</u> does apply, the provisions at issue here are vulnerable. Perth Amboy is adamant that the Court take into consideration that it seeks to enforce a public entertainment ordinance regulating a festival, whereas The Nationalist Movement was holding a political event. Perth Amboy argues that this distinction makes the <u>City of York</u> decision inapplicable.

The Perth Amboy ordinance covers "public entertainment," which is defined as:

Any gathering or assemblage on private or public property, whether or not an admission fee is charged or a donation is solicited, which gathering or assemblage is held for the purpose of selling or exhibiting foods, beverages, goods, wares or services, or for the purpose of conducting or holding performances of any kind, including but not limited to festivals, carnivals, circuses, concerts, exhibitions, or shows. Sporting events, parades and religious gatherings conducted exclusively by not-for-profit organizations or educational institutions shall not be considered public entertainment for the purposes of this chapter.

(§ 343-1.)

8

The York ordinance, which styles itself as a public meetings ordinance, "prohibits persons from '[c]onduct[ing] a public assembly, parade, picnic, or other event involving more than twenty-five individuals' on public land without first obtaining a permit." City of York, 481 F.3d at 181 (quoting § 741.03(c)(1)(A)).   As such, it is broader than the Perth Amboy ordinance and, significantly, encompasses the same activities as the Perth Amboy ordinance.  Put otherwise, if Comité were organizing its festival in York, the ordinance discussed by the Third Circuit and found wanting would apply to it.  Perforce, the City of York case must be taken into consideration in deciding the issues in dispute here.

But before putting the ordinance to a City of York test, the Court must address the position consistently advanced by Perth Amboy, namely that what is before the Court "is not a first amendment issue, it's a festival issue."  Perth Amboy contends that events like festivals, with music, food, and pageants, are not entitled to first amendment protections in the manner of a political rally or parade.  The Court is not persuaded; to the contrary, established law teaches that a "festival issue" is always a "first amendment issue."

The record demonstrates that on Comité's 2005 permit application, the stated purpose of the Hall Avenue Festival was "to celebrate the cultural music and contributions of the Puerto Rican community."  (Ex. P-5.)  Aside from the explicit reference to the culture and contributions of a group, which has its own resonance, the application presents music as a focus for the festival.  The Supreme Court has held that "[m]usic, as a form of expression and communication, is protected under the First Amendment."  Ward v. Rock against Racism, 491 U.S. 781, 790 (1989).

> Music is one of the oldest forms of human expression. From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compositions to serve the needs of the state. See 2 Dialogues of Plato, Republic, bk. 3, pp. 231, 245-248 (B. Jowett transl., 4th ed. 1953) ("Our poets must sing in another and a nobler strain"); Musical Freedom and Why Dictators Fear It, N. Y. Times, Aug. 23, 1981, section 2, p. 1, col. 5; Soviet Schizophrenia toward Stravinsky, N. Y. Times, June 26, 1982, section 1, p. 25, col. 2; Symphonic Voice from China Is Heard Again, N. Y.

> Times, Oct. 11, 1987, section 2, p. 27, col. 1. The Constitution prohibits any like attempts in our own legal order.

Id. The Court has also held that "entertainment" is entitled to first amendment protections.

> Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952); Schacht v. United States, 398 U.S. 58 (1970); Jenkins v. Georgia, 418 U.S. 153 (1974); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975); Erznoznik v. City of Jacksonville, 422 U.S. 205 (1975); Doran v. Salem Inn, Inc. 422 U.S. 922 (1975). See also California v. LaRue, 409 U.S. 109, 118 (1972);[Young v. American Mini Theatres, Inc., 427 U.S. 50, 61-62 (1976)].

Schad v. Mt. Ephraim, 452 U.S. 61, 65-66 (1981) (holding an ordinance that prohibited all live entertainment in the Borough, including "plays, concerts, musicals, dance, or any other form of live entertainment," implicated first amendment concerns). See also Marilyn Manson v. N.J. Sports & Exposition Auth., 971 F. Supp. 875, 884 n.7 (D.N.J. 1997)(Wolin, J.)(enjoining New Jersey Sports & Exhibition Authority from preventing the "OzzFest '97" concert, which included performer "Marilyn Manson"). The Court has found that non-obscene nude dancing is entertainment that implicates first amendment concerns. Schad, 452 U.S. at 66. The conclusion to be drawn is that this festival squarely fits within the first amendment's protections as a music and entertainment event, and Perth Amboy is mistaken in arguing otherwise.

The Court concludes that the Third Circuit analysis in City of York applies in this case, and rejects Perth Amboy's reliance on the fact that the event here was a festival and in City of York, the court was dealing with a political rally. The first amendment analysis, to have force, cannot change its spots based on the event— what is at stake is freedom of speech and the cases say it is protected whether speech takes the form of music, dancing, other cultural expression, or a protest. If Perth Amboy is suggesting that a higher level of scrutiny was applied in City of York because of the nature of the planned event, it misreads the case. Nowhere in City of York is there a line drawn through

the offending provisions because they affect a protest rally (and therefore might be passable if only a parade were involved).

        *c.*   Reviewing the Constitutional Parameters for the Perth Amboy Ordinance

Under established first amendment law, then, how can Perth Amboy regulate its festivals? The Supreme Court case of Cox v. New Hampshire, 312 U.S. 569 (1941), certainly provides a historical starting point.  There, the Court upheld an ordinance regulating the use of city streets for parades, reasoning:

> If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets. We find it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right.

Id. at 576.  But the municipality was not without restraints, and the Cox decision discussed some of the safeguards the ordinance contained.

> [T]he licensing board was not vested with arbitrary power or an unfettered discretion; that its discretion must be exercised with "uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination"; that a "systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways, is the statutory mandate." The defendants, said the court, "had a right, under the Act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in time, place and manner as would avoid disturbance."

Id. (discussing the New Hampshire supreme court's interpretation of the statute).  The basic principle to be drawn from Cox is that the government can regulate first amendment expression within constitutional constraints.  This includes imposing a permit requirement.

In Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992), the court set forth the constitutional requirements for a permit application process.

> Such a scheme . . . must meet certain constitutional requirements. It may not delegate overly broad licensing discretion to a government official. See [Freedman v.

11

> Maryland, 380 U.S. 51, 56, 13 L. Ed. 2d 649, 85 S. Ct. 734 (1965)]. Further, any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication. See United States v. Grace, 461 U.S. 171, 177, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983).

Id. at 130.  As discussed above, these are precisely the standards the Third Circuit applied in striking certain provisions of the York ordinance.

So to be crystal clear, when this Court examines the Perth Amboy public entertainment ordinance provisions that are challenged here, it must determine if the provisions fit within the test articulated by the Supreme Court and Third Circuit: (1) the ordinance may not delegate overly broad discretion and (2) the ordinance sets forth content-neutral, narrowly tailored regulations that serve a significant government interest and leave open alternative channels of communication. In the Third Circuit, "a restriction on speech or expressive activity is narrowly tailored if its effect on First Amendment freedoms is essential to further the governmental interest that justifies incidental interference with First Amendment rights in the first place." Mitchell v. Comm'n on Adult Enter. Establishments, 10 F.3d 123, 137 (3d Cir. 1993).  And, a regulation does not leave open ample alternative channels of communication when "the remaining modes of communication are inadequate." Id. at 139 (internal quotations omitted).

Where the Court parts company with Perth Amboy relates to precisely the foregoing parameters. Perth Amboy argues that Cox did not invalidate a parade ordinance based on a lack of standards, which this Court interprets as an argument that in this entertainment-focused ordinance, there is no constitutional requirement for articulated standards and other guidelines or formulae constraining the fire, police, public works departments and city administration in their recommendations to the mayor.  Cox held that a municipality may give consideration to the time, place, and manner of how the public streets are used, true, but Cox required that such consideration must be "without unfair discrimination." 312 U.S. at 576.  And critically, Cox was followed up some

40 years later by <u>Forsyth County</u>, where the Supreme Court announced that "[i]f the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." 505 U.S. at 130-31 (internal quotations and citations omitted). Perth Amboy ignores this bedrock holding in <u>Forsyth County</u> and has overlooked the significant amount of fact assessment, exercise of judgment, and opinion, personal and group, that its municipal authorities revealed when they testified about the 2005 application process.

**III.    Testimonial Support for a First Amendment Challenge Based on _Forsyth County_ and _City of York_**

Through the testimony of witnesses, the record reflects the challenged ordinance "in action." Jennifer Carmona, the former president of Comité, testified that after the permit application for the 2005 festival was filed in February, there was no communication from city officials until the end of March. After inquiries about this delay, Comité was told that the business administrator, Donald Perlee, was waiting for the bill from the police department in order to complete the application process. (1T-44.)[1]  When Donald Perlee testified, he explained that the delay was due to a big snowfall and his own illness at the time.  He also gave insight into the communications among city officials as they explored the prospect of another festival in light of problems that arose during the 2004 festival. (2T125-28.) The festival had taken place every year since 1993 and Comité was specifically formed to work with Perth Amboy for that event (1T9-10), so the reasonable expectation was that Comité would submit its annual application.

Chief of Police Kohut testified that in March, 2005 city officials met with Comité, describing the meeting as

> an unusual event that we never had before, where we sat down with organizers and identified areas of concerns we had from the past, from the 2004 event, and they

---

[1] "T" refers to the transcript of the bench trial before this Court.  "1T" refers to testimony taken on May 14, 2008; "2T" refers to testimony taken on May 15, 2008.

seemed to disagree with things that were found. * * * *  And they were, I guess, argumentative over those issues and what we are trying to do is say, listen, we're going—got to move from here to go to here and understand what happened and it just got out of hand and they started arguing and the next thing you know, the meeting was over.

(2T55.)  Chief Kohut was at that March meeting because, as he testified, his role in the application process was to review permit applications in connection with public entertainment events "and make recommendations to the business administrator." (2T4.)  No written policy exists regarding his recommendations and he confirmed that he has total discretion to consider and weigh factors, and there is no set formula guiding his decisions.  (2T5.)  "There is no set formula due to the fact . . . there is a lot of issues and a lot of things you have to take into consideration." (2T5.)

The following testimony demonstrates how wide open the police chief's decision process actually is.

> Q:  And you can take those things into consideration in any particular way and give them any particular weight you choose; is that correct?
>
> A:  Well, as a police officer, you take in everything, you don't put a weight on anything.   You take all the totality of the circumstances and all the information that you have an try to make a determination.
>
> Q:  But you can weigh the information any way you choose; is that correct?
>
> A:  You can, but you don't.
>
> Q:  As police director, do you have discretion to weigh those factors as you choose and put whatever weight you wish to put on them?  As police director, do you have that authority?
>
> A:  I have that authority, yes, sir.
>
> Q:  Okay.  And on top of that, the Perth Amboy Police Department is not required to explain the basis for its recommendation on a public entertainment permit application in writing, either to the City Council or the applicant; is that right?
>
> A:  Well, actually we don't have to do it in writing, but we sit down with each and every applicant.  We meet with them and discuss the issues, talk to them and work out all of the parameters and issues that are there.
>
> Q:  But it's not required that you do that, and it's not required that you put it in writing; is that correct?
>
> A:  That's correct.
>
> Q:  As Chief and director, you also set the minimum police security requirement for festivals, don't you?
>
> A:  Yes, sir.
>
> Q:  And you decide how many police officers an applicant must hire for its festivals, don't you?
>
> A:  Yes, sir.

14

(2T5-6.)

According to Chief Kohut, the absence of formulae, rules, and guidelines is a function of the process. "[T]here is no formula or there is no minimum and there can't be a cookie cutter formula to constrain or restrain the Chief or the police department in ensuring public safety." (2T8.) Business administrator Donald Perlee, who served in that capacity from 1994 until his retirement in 2007, corroborated Chief Kohut. He testified that there is no written guidance or policy document for the business administrator to follow:

> There's no written policy. The ordinance itself is the framework that guides the Administrator in reviewing the application and making a recommendation to the Mayor and Council. * * * * [T]here is not a specific provision in the ordinance [for the police, fire, or public works directors to follow] other than they are responsible to meet with the Administrator and to provide input in making a recommendation that can be formulated and ... provided on to the Mayor and Council.

(2T90.) He described the process as follows:

> The [business administrator] has a responsibility under the ordinance to review the applications submitted by various organizations, after it's received through the City's Clerk office. And the Administrator is to convene a meeting with the Directors of Police, Public Works and Fire, in order to review the application for compliance under the certain provisions of the ordinance.
>
> And what we also do is we look at the prior history for the various organizations and how the festivals were conducted.

(2T89 (emphasis added).)

On that last point, both officials testified that events occurring on the second day of the 2004 festival had considerable bearing on how they approached the 2005 permit application when it came before them. In a March 24, 2005 memo introduced at trial, Perlee noted that Comité's "failure ... to adhere to the limitation of hours of operation, failure to properly clean and restore the public streets and sidewalks during and after the conclusion of the event, and the confrontational manner in which the event organizers interacted with the police when the event went well past the permitted time." (Ex. D-20.) Although there is strong disagreement about how individuals

15

interacted at the time, there is no dispute that because the headline entertainer arrived late, Comité approached city officials about extending the ending time of the festival so that he could perform his full set, and was told that if the festival was extended past the 8 p.m. closing time, Comité would have to pay for the police overtime. Police Chief Kohut testified that Carmona threatened to tell the audience that the police were shutting down the event, which could have caused a riot. Carmona denies making such a threat, and testified that Chief Kohut made a signal to cut off the amplifiers in the middle of the performance, which he denies. Ultimately, Wilda Diaz of Comité agreed to pay for the police overtime and the performance was not interrupted.

The reference in the Perlee memo to cleanup relates to the city's allegation that Comité did not properly clean up the streets after the festival, requiring city sanitation workers to work until 2 a.m. to restore the festival area. This is sharply contested; according to the record by way of affidavits filed on behalf of Comité, its members properly cleaned up after the festival and city workers did not remain after the members had cleaned up. (D.E. 49 (Santos Dec. ¶¶ 4-8; Pacheco Dec. ¶¶ 4-8).)

So the application process in 2005 was burdened from the start by the perceptions of the municipal officials who would be making recommendations to the mayor. Donald Perlee testified that "[a]s a prelude to our first meeting with the Committee organizers, we did discuss various issues that related to the cleanup restoration, activities that took place at the prior year's festival because there had been a concern." (2T91.) Perlee testified that "cleanup issues were one of the sticking points" in approving Comité's 2005 festival application and one of the reasons he communicated to the city council for denying the application. (2T94.) As indicated, Comité disputes that it failed to clean up the festival site adequately. Nonetheless, the city's opinion on that disputed issue controlled.

Chief Kohut testified that he made recommendations that the permit be denied based on "the threat, the extra time that was spent, the additional time, the fact that the entertainer arrived

16

late . . . ."  (2T60.)  As indicated, Carmona denies making a threat to incite a riot.  Chief Kohut's opinion and judgment controlled, however, when it came to making the recommendation to deny the permit.

Chief Kohut also testified that he was worried that the number of people going to the festival might approach 10,000 in 2005 and he did not have sufficient police presence.  (2T46.)  At a council meeting in 2005, Kohut testified that he told those assembled, "I said, as it grows, going from 3,000 to 5,000 to 7,000 to 10,000, I don't believe that [at] 10,000 we're going to be able to provide the security for this event." Id. But this concern was not among those he communicated in recommending against the festival.  Chief Kohut specifically did not tell the members of Comité that he either knew or suspected that he would not have sufficient police officers for the 2005 festival.

These witnesses establish that they made recommendations to the city council to deny the festival permit application based on events that it turns out were in dispute.  Moreover, it appears that Chief Kohut harbored serious reservations about his department's ability to police the festival at all, which he did not communicate to the organizers.  That point of view represents his judgment, not shared but acted upon.  So it appears that recommendations to deny the permit were made by the police chief and the business administrator per the ordinance—admittedly without recourse to written policy or guidelines and communicated to the council without the requirement of input from the applicant—based on perceptions about past events that the applicant would not and did not agree with, or on concerns not communicated to the applicant at all.

Moreover, there was a practical impact of Chief Kohut's freedom to consider the totality of circumstances in deciding security issues without the constraints of a formula or guidelines. Carmona testified that in 2003, the bill for police security was $5,985.  In 2004, Comité paid $11,060.  "I believe that was the year that they say there were gangs in Perth Amboy and they

17

needed to increase the security." (1T19.)[2] Perlee also testified that in 2005 there was a proposal floated to Comité that it hire the public works department to clean up. (2T93-94.) Evidently, the cost of the festival could and did fluctuate considerably depending upon the judgment of city officials. Nor was Chief Kohut amenable to tweaking the ordinance or creating policy guidelines by providing notice about costs, for example specifying the consequences of extending festival time. In response to an inquiry from the Court about providing an advance indication that organizers would have to fund police overtime if an event was behind schedule, he responded:

> [T]hat then gives everyone the opportunity to extend the closing time of an event to 9 o'clock and even 10 o'clock. * * * *  If we give that option all of the time extending the ordinance for another hour or two because, then, you know, I foresee when you give a loophole, give anybody a loophole, sometimes they take advantage and then it is a disadvantage to the residents. * * * * So again, my concern is that if we leave that open, how long are we going to give them that opening to use? Going to be an hour or two, can they go for two hours if something happen?  Or are they going to take advantage."

(2T80-81.) According to Chief Kohut, the ordinance does not place any obligation on him to justify costs payable by the applicant for the coverage he determines the city will need. "I guess if they asked the question, but normally we just sit down and discuss what's required.  If they ask me why did I increase, I'd give them the answer.  But I don't know other than the festival for this event [if] organizers ask me those questions.  I don't think anybody else ever asked why or what. "  (2T77.) From the foregoing testimony, the Court can draw no other conclusion other than the police chief's discretion is unbridled and his recommendations are not subject to explanation or justification.

Exposed to the glare of first amendment scrutiny, this broad discretion is disturbing, and so is the fluctuating financial impact on Comité.  Moreover, decision-makers' perceptions about the 2005 festival based on the unresolved issues following the 2004 festival appear to be responsible for the city's decision to impose the ban on amplified music in 2005.  This was the trigger for the

---

[2] As Donald Perlee testified, one of the reasons for delaying communication to Comité about the fate of the 2005 permit was the need to determine the cost of police security.

emergent application that began this case. Although the city withdrew the ban after suit was filed, its attempt to impose that restriction speaks loudly about how much power and maneuvering could take place under the regime set forth in the ordinance. From Donald Perlee's testimony it appears certain that the officials were conscious of a connection between amplified live music and the crowd that the festival would draw. "I think there was an acknowledgment on both sides that [live amplified music] probably would result in a different attendance, you know, at different intervals during the festival." (2T99.) Comité submitted evidence establishing that the city did not impose such a ban on the Chamber of Commerce festival. Perlee was directly asked at the trial if the 2005 decision to ban live amplified music stemmed in part from the intent to reduce the size of the crowd, and he responded affirmatively.

> In part, it was a consideration as to the, um, as to the ability of the police department to provide necessary public safety. And it was in consideration, primarily it was consideration for compliance with the ordinance, because as I said, that discussion and that consideration only took place at the third meeting with the Committee representatives. And so it really came up just prior to that meeting.
> And in discussion with our law director at the time, it was something that we were advised that we should be enforcing all aspects of the ordinance.

(2T101.) This testimony establishes that yet another municipal official, the law director, weighed in on the fate of the 2005 festival by advising the council to "enforce all aspects of the ordinance." Perlee's testimony reveals how nebulous the standards of decision had become.

Or maybe "ambient" is a better description. The 2005 decision to deny the permit, the testimony established, was circumfused by the city officials' reaction to the 2004 festival. From Perlee's testimony:

> Q:   You already indicated you did not attend the 2004 festival; is that correct?
> A:   No I did not.
> Q:   Mr. Perlee, at the conclusion of that festival, did you in your position as business administrator, did you get reports as to how the event had come off, how it had operated?
> A:   Yes, I did.
> Q:   And were there aspects of that report that were critical of the 2004 festival?
> A:   Yes, there was.

19

Q:  And could you be specific.  What were the areas of criticism of the 2004 festival?

A:  Well the first criticism was a Monday morning following the festival, I believe the Public Works director, was either in my office or on the phone, I don't remember how the conversation took place.  I believe he may have actual been in my office, he was there first thing in the morning to let me know what had transpired, particularly at the end of the festival.  And the issues related to the deplorable conditions that the surrounding area was left in.  The amount of time that the Public Works employees were required to restore the area to clean up the area.  The lateness of the hour, actually progressed into the next day into the morning, because he was concerned that either my office, the Mayor's office or City Hall in general would receive complaints and criticisms about the festival going so late . . . .
    ****

Q:  Now, regarding the 2004 festival, did other department heads bring forth concerns regarding the operation of that festival?

A:  Yes.

Q:  And who specifically brought concerns to you?

A:  It was the police department.

Q:  What was the nature of the concerns that were brought to your attention?

A:  Had to do with the conduct.  Had to do with several factors.  Had to do . . . with the fact that [during] the festival [it] was difficult finding people in charge.  Had to do with the festival running over the permitted times.  And the most alarming was fact that there was a confrontation near the end of the festival on the last day of the festival, that was a most concern.

(2T111-12; 2T114-15.)   When Comité's 2005 festival permit application arrived, under the application process in the ordinance municipal officials could, and did, make negative recommendations based on their assessment of what happened in 2004.  On at least Perlee's part, the assessment was based on facts derived from second-hand information.   The ordinance permitted numerous requirements to be imposed on Comité, which if refused, would doom the festival. [3]  The ordinance permitted vagaries like "enforcing all aspects of the ordinance" to support

---

[3] At the trial, Comité introduced a May 2005 memorandum of understanding that it was required to sign to obtain approval for the festival.  In this document, Comité agreed to pre-pay contracts for off-duty police officers to work the festival, obtain prepaid, fully executed contracts for light towers, and obtain prepaid fully-executed performance contracts for entertainment that concluded an hour

a ban on live amplified music at Comité's festival even though the Perth Amboy Chamber of Commerce festival featured live amplified music. The police chief and business administrator gave candid testimony about how they made their negative recommendations, relying on their view of the facts, their professional judgment, and their opinion. And in so doing, they walked the Perth Amboy ordinance right into the forbidden territory identified by <u>Forsyth County</u>: "If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." 505 U.S. at 130-31 (internal quotations and citations omitted).

Based on the foregoing, the Court finds the application process set forth in Section 343-3 is not "narrowly tailored to serve a significant government interest" and instead vests the licensing authority with the freedom to appraise facts, exercise its own judgment, and form opinions, contrary to the law established in <u>Forsyth County</u>. The challenged provisions of the application process, § 343-3(E, F, G), are stricken on first amendment grounds.

## IV.    <u>Remaining Challenged Provisions</u>

The restoration bond requirement, the insurance and hold-harmless requirements, and the minimum security requirement—the balance of the challenged provisions—are not cabined by definite guidelines or written policy and based on the foregoing analysis, arguably all these provisions fall. Particularly the minimum security requirement—how much police coverage the city orders, and how great the cost to organizers—involves an exercise of discretion that Chief Kohut's testimony has shown is boundless and, in his professional opinion, should be jealously guarded.

---

before the scheduled end time. Comité had to secure insurance, ensure the city streets were clean during and after the festival, and obtain a $2,000 restoration bond. (Ex. D-47, 49.)

But City of York teaches that these requirements in the ordinance are unconstitutional for another reason—all of them allow content-based costs to be assessed against the applicant for a public entertainment event. The York ordinance required the applicant to "promise and covenant to bear all costs of policing, cleaning up, and restoring the park upon conclusion of the event or activity [and] to reimburse the City for any such costs incurred by the City." City of York, 481 F.3d at 181 (quoting York ordinance § 741.03(d)(6)). This reimbursement provision was stricken by the Third Circuit on grounds that it would permit York to charge for content-based costs, such as the reaction of others to the speaker. Id. at 185. "An applicant who signed the agreement required by the reimbursement provision would have no way of knowing the scope of the liability to which it might be subjecting itself. Although an applicant can plan for the level of participation by members of its organization, it simply cannot accurately anticipate the actions of others or the anticipated reaction of the police." Id. at 186. The court characterized the provision as "ripe for abuse" because it gave the city "unlimited discretion which could easily be used to punish (or intimidate) speakers based on the content of their messages." Id. at 186-87. "Given the substantial expense that could be levied upon a speaker, and the almost limitless possibility of abuse, it is an understatement to conclude that this provision chills constitutionally-protected speech." Id. at 187.

Perth Amboy's ordinance permits municipal officials to make content-based decisions in determining deductions from the restoration bond imposed on permit applicants. The city can charge the applicant "for costs incurred as a result of the failure of the applicant to adequately clean and restore the location of the event." (§ 343-4(A).) Trial testimony revealed how conscious the municipal officials were of the crowd that the festival drew—its size and its character—as revealed by the effort to ban amplified music. Unlike the discussion in City of York, this Court need not project what might happen under the Perth Amboy ordinance. Testimony shows that content based decisions were made.

22

Comité also challenges the insurance and hold harmless requirements.  As indicated, the Perth Amboy ordinance reads as follows:

> A special permit for a public entertainment event on property owned by the City of Perth Amboy shall not be issued until the applicant has obtained a general liability insurance policy, with the City of Perth Amboy as a named insured, in the amount of one million ($1,000,000) for the event for which a permit is sought.  In addition, a permit shall not be issued until the applicant executes a hold harmless and indemnity agreement to the benefit of the City of Perth Amboy.  Proof of the liability insurance and hold harmless and indemnity agreement required as a condition precedent to the issuance of a permit shall be provided to the City Clerk no later than fifteen (15) days before the first day of the event for which a permit is sought.

(§ 343-9.)  The analogous provision in the York ordinance requires the speaker "to indemnify the City and hold the City harmless from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the permittee," its officers or agents.  City of York, 481 F.3d at 181 (quoting York Ordinance § 741.03(d)(6))(emphasis added)).  The Third Circuit concluded this provision was narrow enough to pass constitutional scrutiny. Id. at 186 n.9.  Comparing both provisions, this Court notes that the Perth Amboy provision contains no limiting language—the city can, in effect, hold the organizer liable for how others react to the content of the event.  This is a critical distinction that offends first amendment principles.

Finally, Comité argues that the minimum security requirement allows the police unlimited discretion to set the number of police officers using content-based considerations.  Here, the proscription in City of York cannot be denied.

> To require an applicant to agree to pay this unquantified fee—which is based substantially on the anticipated and actual reaction of others—before it can speak is an unconstitutional chilling of speech

Id. at 186.  Chief Kohut has candidly described, and strongly defended, his authority to make assessments of security needs, both before and at the festival, without any limitations, and then charge Comité for these costs.  (§ 343-10(F).)  Indeed, the most confrontational moments during the

23

2004 festival arose directly out of the demand that Comité pay the increased costs for police overtime.

The restoration bond requirement, insurance and hold-harmless requirements, and imposition of a minimum security requirement all fail first amendment scrutiny based on <u>City of York</u>. The Court also notes that a lack of an indigency provision renders these provisions constitutionally infirm under <u>City of York</u>, where the Third Circuit noted that a fee which would "burden the free speech rights of those speakers too indigent to afford its payment,"481 F.3d at 184, would likely offend the constitution, citing to <u>Central Florida Nuclear Freeze Campaign v. Walsh</u>, 774 F.2d 1515 (11th Cir. 1985), which held "[t]he granting of a license permit on the basis of the ability of persons wishing to use public streets and parks to demonstrate, to pay an unfixed fee for police protection, without providing for an alternative means of exercising First Amendment rights, is unconstitutional." <u>Id.</u> at 1523-24.

V.   **Conclusion**

Based on the foregoing analysis and with the benefit of a trial record, the Court finds four portions of the Perth Amboy public entertainment ordinance unconstitutional: (1) the permit application process (§ 343-3(E, F, G)); (2) the restoration bond requirement (§ 343-4); (3) the liability insurance and hold harmless requirements (§ 343-9); and (4) the minimum security requirement (§ 343-10). The Court permanently enjoins Perth Amboy from enforcing these provisions. An appropriate order will be entered.

/s/Katharine S. Hayden
KATHARINE S. HAYDEN
United States District Judge

Dated: June 26, 2008

24